## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TOMMY J. BADEAUX;<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH R. BIDEN, President of the United States in his official capacity; MIGUEL A. CARDONA, United States Secretary of Education in his official capacity; UNITED STATES DEPARTMENT OF EDUCATION;<br><br>Defendants. | **)**<br>**)**<br>**)**<br>**)**   Civil Action No. 2:22-cv-4247<br>**)**<br>**)**   **COMPLAINT FOR DECLARATORY,**<br>**)**   **INJUNCTIVE, AND OTHER RELIEF**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)** |

## <u>INTRODUCTION</u>

Plaintiff Tommy Badeaux is a husband, father, and lawyer, who takes pride in providing legal services to south Louisiana. Tommy did not come from money. Like many other Americans, he took out extensive loans to make his way through school. Despite a difficult job market upon graduation, through hard work and enterprise Tommy established a successful legal practice. He still owes a significant amount in student debt, but he does not qualify for the Biden Administration's newly announced Public Debt Cancellation. And no one asked how the program would affect him or his family: the rules for the new program were crafted in secret, without required administrative input.

No one asked Congress either. The United States Constitution vests in Congress the power to legislate and appropriate – a deliberative process that takes into account Tommy's opinions because of Tommy's power to replace lawmakers through the ballot box. But the

unelected bureaucrats who crafted the Public Debt Cancellation in secret are not accountable to Tommy and they operated in contravention of Congress's clear instructions regarding debt.

Now, defendants are trying to avoid asking the judiciary. The crafters of the Debt Cancellation Program have done all they can to try to create a "standing dead zone" that deprives litigants of the opportunity to challenge their unconstitutional actions in court, including changing the program repeatedly after legal issues were raised in the lower courts. But Constitutional and statutory violations of such import merit judicial review.

This action is based upon Defendants' brazen violation of Constitutional separation of powers and the Administrative Procedure Act's notice-and-comment procedures. These abrogated procedures exist to ensure public input and transparency in government actions. Instead of following the law, the Biden Administration concocted a massive Public Debt Cancellation in secret that will cost taxpayers like Tommy over half a trillion dollars of additional public debt at a time of soaring deficits and unprecedented inflation – and that did not even consider Tommy.

Tommy seeks recourse in this Court to vindicate the Constitution and the Administrative Procedure Act and to stop an arbitrary and capricious wealth transfer that did not follow the rules.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution of the United States and federal law.

2.      This Court has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the United States.

3.     This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff.

4.     This Court has jurisdiction to review Defendants' unlawful actions and inactions and enter appropriate relief under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

5.     This Court has jurisdiction to review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action. *Larson v. Dom. & Foreign Commerce Corp.*, 337 U.S. 682, 689-92 (1949).

6.     This Court has authority to award the requested relief pursuant to 42 U.S.C. § 2000bb-1 and *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020); the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; the requested injunctive relief pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 2202; and award costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are officers and employees of the United States and agencies of the United States, and a substantial part of the events or omissions giving rise to the claims occurred within this district where Plaintiff resides and which is most convenient for Plaintiff.

## **PARTIES**

8.     Plaintiff Tommy J. Badeaux operates a legal practice in this judicial district.

9.     Defendants are United States officials and agencies responsible for implementing the student-loan-debt-cancellation plan known as the One-Time Student Loan Debt Relief plan (hereinafter "Public Debt Cancellation" or "the Plan").

10.     Defendant Joseph R. Biden is sued in his official capacity as President of the United States.

3

11.     Defendant Miguel A. Cardona is sued in his official capacity as Secretary of the U.S. Department of Education.

12.     Defendant U.S. Department of Education is an agency of the United States.

## FACTUAL BACKGROUND

### The Supposed Statutory Authorization

13.     In August of 2003, in the wake of the September 11 terrorist attacks, the announcement of a Global War on Terror, and military operations launched in Afghanistan and Iraq, Congress passed the "Higher Education Relief Opportunities for Students Act of 2003" (hereinafter "HEROES Act of 2003"). In all six of its Congressional findings, the bill celebrated the importance of our nation's defense, and the sacrifices of our nation's military. 20 U.S.C. § 1098aa(b). "There is no more important cause for this Congress than to support the members of the United States military and provide assistance with their transition into and out of active duty and active service." *Id.* § 1098aa(b)(6). The purpose of the Act could not be clearer: to support the Act's eponymous heroes.

14.     Under the HEROES Act of 2003, the Secretary of Education may "waive or modify any statutory or regulatory provision applicable" to federal student loan programs "as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by paragraph (2)." *Id.* § 1098bb(a)(1). Under paragraph (2), the Secretary's action is justified only if "recipients of student financial assistance under title IV of the Act who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* § 1098bb(a)(2). "In general," when the Secretary takes action to waive

or modify under the HEROES Act of 2003, he or she can do so "by notice" publication in the Federal Register. *Id.* § 1098bb(a).

15.     No one ever contemplated that the HEROES Act of 2003 could justify across the board mass student debt cancellation. No such cancellation was attempted in the near twenty (20) years of the Act's existence. The direct question was visited in January 2021 in the wake of the coronavirus pandemic. At that time, then-General Counsel of the Department of Education, Reed Rubinstein, published a legal memo analyzing in detail the question of whether the HEROES Act allowed the Secretary to "cancel, compromise, discharge or forgive, on a blanket or mass basis, principal balances of (federal) student loans." *See* Memorandum from Reed Rubinstein, Acting Gen. Couns., U.S. Dep't of Educ., to Betsy DeVos, Sec'y, U.S. Dep't of Educ., Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority at 1 (Jan. 12, 2021), https://tinyurl.com/RubinsteinMemo (hereinafter "Rubinstein Memo").

16.     The Rubinstein Memo concluded that "the Secretary does not have statutory authority to provide blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, and/or to materially modify the repayment amounts or terms thereof, whether due to the COVID-19 pandemic or for any other reason." *Id.* at 8. It further explained that "(a)lthough Congress could enact legislation authorizing the Department to provide blanket or mass cancellation … of student loan principal balances, and/or to materially modify repayment amounts or terms, it has not done so." *Id.* at 3.

17.     The view that Congress, and not bureaucrats, is empowered to make major decisions about the public fisc such as the cancellation of over half a trillion dollars of public debt[1] was recently commonplace. It was held by congressional leaders in both parties:

> House Speaker Nancy Pelosi (D-CA) told reporters that President Biden does not have authority to cancel student loan debt.
>
> "People think that the President of the United States has the power for debt forgiveness," she said. "He does not. He can postpone, he can delay, but he does not have that power." Pelosi argued that student loan forgiveness can only be accomplished through "an act of Congress."

Adam S. Minsky, *Pelosi: President Biden Does Not Have Power to Cancel Student Loan Debt – What It Means For Borrowers*, FORBES (Jul. 28, 2021) https://tinyurl.com/PelosiForbes (hereinafter "Pelosi Article").

18.     President Biden apparently believed legislation was required. Pre-presidential Biden discussed it shortly after the election:

> Speaking to reporters on Monday, (President-Elect Biden) said student loan forgiveness 'does figure in my plan,' though he seemed disinclined to follow (the executive action) suggestion, citing House legislation that "calls for immediate $10,000 forgiveness of student loans."

Adam Looney, *Biden Shouldn't Listen to Schumer and Warren on Student Loans*, BROOKINGS (Nov. 18, 2021), https://tinyurl.com/BrookingsLoans.  Post-presidential Biden held the same view, according to his Press Secretary:

> White House Press Secretary Jen Psaki confirmed . . . Biden would "happily" sign a bill to enact wide-scale student loan forgiveness. "If Congress wanted to pass and send the president a bill to cancel $10,000 in student debt, he'd happily sign

---

[1] Estimates of the Plan's cost vary widely, with the Congressional Budget Office determining a cost of $430 billion and a budget analysis by Wharton determining a cost of "up to $519 billion." *See* Junlei Chen & Kent Smetters, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton Budget Model (Aug. 26, 2022) https://tinyurl.com/WhartonModel. By contrast, the entire Congressional appropriation for the Department of Education in 2022 was $232 billion. Agency Profile: Department of Education, USASpending.gov, https://www.usaspending.gov/agency/department-of-education?fy=2022.

it," Psaki said. "That obviously hasn't happened at this point in time. There's plenty of time left in his presidency."

*See* Pelosi Article.

19.    Although Biden asked his lawyers, experts doubted they would have much success in getting to yes:

> Biden has asked the U.S. Department of Justice and the U.S. Department of Education to review his legal authority to forgive student debt. Decisions from those agencies are not yet public.
>
> "They are likely to reach the same conclusion as the one reached by Speaker Pelosi," said higher education expert Mark Kantrowitz.

Annie Nova, *Pelosi Says Biden Doesn't Have Power to Cancel Student Debt*, CNBC (Jul. 28, 2021), https://tinyurl.com/CancelAuthority.

20.    But President Biden's lawyers did, somehow, get to yes. On August 23, 2022, the Office of Legal Counsel at the Department of Justice released a memorandum opinion for the General Counsel of the Department of Education. *See* Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, 46 Op. O.L.C. ___ (Aug. 23, 2022) https://tinyurl.com/OLCMemo (hereinafter "OLC Memo"). The OLC Memo concluded that:

> The plain text of the HEROES Act authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to' the federal student loan program, 20 U.S.C. § 1098bb(a)(1) (emphasis added), an authority that encompasses provisions applicable to the repayment of the principal balances of loans, provided certain conditions are met. We conclude that targeting relief towards those individuals who suffered financial hardship because of COVID -19 and who otherwise satisfy the requirements of the Act accords with the Act's requirement that the waiver or modification 'be necessary to ensure that' student loan recipients who are 'affected' by a national emergency 'are not placed in a worse position financially' with respect to their loans as a result. *Id.* § 1098bb(a)(2). Further, we believe that the Secretary may reasonably conclude that class-wide debt relief in these circumstances is appropriate.

*Id.* at 2. The analysis went on to determine that there were three textual requirements to student debt cancellation under the HEROES Act of 2003:

(1) the beneficiary of the cancellation must be an 'affected individual';

(2) the harm sought to be avoided must arise 'be-cause of' the beneficiary's status as such an individual; and

(3) the Secretary must deem the cancellation 'necessary' to 'ensure' the beneficiary is not placed in a 'worse position financially in relation to (the individual's) financial assistance.'

*Id.* at 20. Elaborating on the second requirement, the OLC Memo concluded:

In the absence of any statutory indication to the contrary, we believe that the term "because of" in the HEROES Act carries with it the usual requirement of but-for causation. Thus, to invoke the HEROES Act in the context of COVID-19, the Secretary would need to determine that the COVID-19 pandemic was a but-for cause of the financial harm to be addressed by the waiver or modification.

*Id.* at 21. In sum, these requirements can be described as (1) an "affected" requirement, (2) a "causally related" requirement, and a (3) "no worse off" requirement for the statute to apply.

21.     In another memorandum dated the same day, the Department of Education Office of General Counsel's Lisa Brown rescinded the Rubinstein Memo and concluded that broad based debt cancellation was appropriate under the HEROES Act of 2003:

In present circumstances, this authority could be used to effectuate a program of categorical debt cancellation directed at addressing the financial harms caused by the COVID–19 pandemic. The Secretary could waive or modify statutory and regulatory provisions to effectuate a certain amount of cancellation for borrowers who have been financially harmed because of the COVID–19 pandemic. The Secretary's determinations regarding the amount of relief, and the categories of borrowers for whom relief is necessary, should be informed by evidence regarding the financial harms that borrowers have experienced, or will likely experience, because of the COVID–19 pandemic. But the Secretary's authority can be exercised categorically to address the situation at hand; it does not need to be exercised ''on a case-by- case basis.'' *Id.* § 1098bb(b)(3). That is, he is not required to determine or show that any individual borrower is entitled to a specific amount of relief, and he instead may provide relief on a categorical basis as necessary to address the financial harms of the pandemic.

U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (Aug. 23, 2022), *available at* Notice of Debt Cancellation Legal Memorandum, 87

Fed. Reg. 52,943 (Aug. 30, 2022), https://tinyurl.com/BrownMemo (hereinafter "Brown Memo").

### Announcement of the Program

22.     One day after these memos, the White House "announce(d) student loan relief" via a Fact Sheet. FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most, https://tinyurl.com/LoanFactSheet. The Fact Sheet stated that the Biden Administration would:

> Provide targeted debt relief to address the financial harms of the pandemic, fulfilling the President's campaign commitment. The Department of Education will provide up to $20,000 in debt cancellation to Pell Grant recipients with loans held by the Department of Education, and up to $10,000 in debt cancellation to non-Pell Grant recipients. Borrowers are eligible for this relief if their individual income is less than $125,000 ($250,000 for married couples). No high-income individual or high-income household – in the top 5% of incomes – will benefit from this action. . .

*Id.* The Fact Sheet did not explain how the debt cancellation satisfied the three requirements of the HEROES Act of 2003. *See id.*

23.     On October 12, 2022, the Department of Education published notice in the Federal Register describing the specifics of the "Debt Discharge":

**Debt Discharge**

Pursuant to the HEROES Act, 20 U.S.C. 1098bb(a)(1), the Secretary modifies the provisions of: 20 U.S.C. 1087, which applies to the Direct Loan Program under 20 U.S.C. 1087a and 1087e; 20 U.S.C. 1087dd(g); and 34 CFR part 674, subpart D, and 34 CFR 682.402 and 685.212 to provide that, notwithstanding any other statutory or regulatory provision, the Department will discharge the balance of a borrower's eligible loans up to a maximum of: (a) $20,000 for borrowers who received a Pell Grant and had an Adjusted Gross Income (AGI) below $125,000 for an individual taxpayer or below $250,000 for borrowers filing jointly or as a Head of Household, or as a qualifying widow(er) in either the 2020 or 2021 Federal tax year; or (b) $10,000 for borrowers who did not receive a Pell Grant and had an AGI on a Federal tax return below $125,000 if filed as an individual or below $250,000 if filed as a joint return or as a Head of Household, or as a qualifying widow(er) in either the 2020 or 2021 Federal tax year. This waiver is

> applicable to borrowers with eligible loans who apply by the deadline established
> by the Secretary (to the extent an application is required) and who are determined
> to be eligible by the Department. Borrowers who are eligible for relief without
> applying will have the option to opt out of the program.

Federal Student Aid Programs, 87 Fed. Reg. 61,512 (Oct. 12, 2022), https://tinyurl.com/LoanNotice (hereinafter "Debt Cancellation Notice"). The Debt Cancellation Notice offered no findings to justify how student loan borrowers below these respective income levels met the "worse off" requirements "because of" the pandemic.

24. No Administrative Procedure Act notice-and-comment was conducted for the Public Debt Cancellation. Reliant on the idea that when the HEROES Act of 2003 applies, waivers and modifications only require notice by publication, the Debt Cancellation Notice is the sole legal basis for the cancellation of over half a trillion dollars of public debt. By the Biden Administration's own calculus, this is a final agency action justified by the published legal memos and a substantive rule that determines legal rights and obligations. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

25. The justification that COVID-19 forms the national emergency that triggered the Public Debt Cancellation is undermined by statements from President Biden and his officials that the emergency is over. For example, in April 2022, the Administration lifted Title 42 restrictions on immigration that were based on the threat of COVID-19 while noting that "97.1% of the U.S. population lives in a county identified as having 'low' COVID- 19 Community Level." *CDC Public Health Determination and Termination of Title 42 Order*, Centers for Disease Control and Prevention (Apr. 1, 2022), https://tinyurl.com/CDCNotice. On September 18, 2022, President Biden declared that "the pandemic is over." Rebecca Falconer, *Biden: "The pandemic is over,"* Axios (Sep. 18, 2022), https://tinyurl.com/AxiosPandemic.

26.     The claim that the Debt Cancellation Program is "necessary" to help affected individuals harmed by a national emergency as required by the HEROES Act of 2003 is belied by the fact that student loan borrowers are in a broadly improved financial position after the pandemic. The Trump and then Biden Administration delayed payments and interest for student loans since April of 2020, so borrowers have been the beneficiaries of no interest loans for over two years. The Biden Administration's spending bouts have led to inflation running at upwards of 8% per month throughout the course of 2022, which harms lenders but helps borrowers by diminishing the amount that dollars are generally worth. Jeff Cox, *Inflation Increased .4% in September, More Than Expected Despite Rate Hikes*, CNBC (Oct. 13, 2022) https://tinyurl.com/SeptInflation. The Administration's claims that these categories of borrowers have been economically disadvantaged by the pandemic in a "but for" fashion required by the HEROES Act of 2003 and justifying mass debt cancellation contradicts basic economics.

**Legal Challenges and Evading Judicial Review**

27.     The Defendants' crafted the Public Debt Cancellation notice with the intent to construct a program that deprives potential litigants of standing to challenge their actions. Defendants' have continued to shift the goalposts on the program after the fact in continued attempts to bar meaningful judicial consideration.

28.     As lawsuits have mounted, the program has quickly changed to evade review. In response to a lawsuit by a public service loan repayment program employee who would face a state tax penalty were the plan to forgive some of his student loans, the Biden Administration quietly added an opt-out provision that undermined the litigant's standing and led to the dismissal of the case. *See Garrison v. U.S. Dep't of Ed.*, 1:22-cv-1895 (S.D. Ind. Sept. 27, 2022). In an effort to do the same in a lawsuit filed by six state attorneys general, the Biden

Administration carved out part of their case by changing the loan types that would qualify for relief. *See Nebraska v. Biden*, 4:22-cv-1040 (E.D. Mo. Sept. 29, 2022).

**Impact on Plaintiff**

29.     Plaintiff Tommy Badeaux is ineligible for any loan forgiveness under the Public Debt Cancellation because he makes more than the financial cut-off amounts designated in the Debt Cancellation Notice. Tommy believes that if the Biden Administration is going to cancel debts, his student loan debt should be cancelled too. Tommy wants an opportunity to present his views to the Department of Education and provide comments on any proposal from the Department of Education to forgive student loan debts.

**FIRST CAUSE OF ACTION**

**Violation of Plaintiff's Rights under the**

**Appropriations Clause of Article I Section 9 of the Constitution**

30.     Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs of this Complaint.

31.     Article I Section 9 of the Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations by Law."

32.     The framers of our Constitution wisely placed the power of the purse in the hands of the branch of government most directly accountable to the people. *See*, *e.g.*, Federalist, No. 78 (Hamilton) ("The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated."); Federalist, No. 58 (Madison) ("The power over the purse may (be) the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people."). This power of the purse in

the hands of the Legislature was specifically intended as a check against the monarchical power of the Executive. *Id.*

33.     The clause is intended "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (internal citation omitted). "Congress's control over federal expenditures is absolute." *U.S. Dep't of the Navy v. Fed. Labor Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012).

34.     No Act of Congress has made an appropriation to cancel over half a trillion dollars of public debt that is owed to the Treasury. In fact, Congress has carefully considered and crafted specific programs of debt forgiveness in certain circumstances. Most notably, under the College Cost Reduction and Access Act of 2007, Pub. L. No. 110-84, 121 Stat. 784, Congress passed a program that includes Public Service Loan Forgiveness – a program that discharges student debt for student debt holders after ten years of qualifying public service (including military, government, or non-profit service). *See* 20 U.S.C. § 1087e(m). The agency's claim to have the power to cancel far more debt with far less Congressional clarity defies reason.

35.     When an agency relies on an "old statute employed in a novel manner," it must look to Congress's clear pronouncements. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617-18 (5th Cir. 2021). Here, the Department of Education is using a statute passed in 2003 to justify a "novel" cancellation of an amount of public debt that surpasses the agency's very budget appropriation. "There is no clear expression of congressional intent" for these actions in the HEROES Act of 2003 and the court should "not infer one." *Id.* (collecting cases).

36.     As a violation of the Appropriations Clause, the Public Debt Cancellation is unconstitutional.

## SECOND CAUSE OF ACTION

### Violation of Plaintiff's Rights under the

### Vesting Clause of Article I Section 1 of the Constitution

37.     Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs of this Complaint.

38.     Article I, Section 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

39.     Congress may not "abdicate or . . . transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). Were Congress to do so, it would violate fundamental principles of nondelegation.

40.     Waiving or modifying provisions of an Act of Congress is a legislative function that is vested solely in Congress and may not be exercised by an executive agency. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

41.     The President's "power, if any, to issue (an) order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer, 34*3 U.S. 579, 585 (1952). "Agencies have only those powers given to them by *Congress." W. Va. v. EPA*, 142 S. Ct. 2587, 2609 (2022). When "taxing and spending power" is exercised, it must be in conformity with the rest of Article I, specifically the Appropriations Clause, which prevents the

14

Executive Branch from obligating the Government to pay money without statutory authority. *See* U.S. Const. art. 1, § 9, cl. 7.

42.     When the Secretary seeks to interpret a broadly worded statute, the Major Questions Doctrine is implicated. "Courts expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *BST Holdings, L.L.C.*, 17 F.4th at 619 (internal quotation marks omitted). "(E)xtraordinary" claims of executive power must be based on "clear congressional authorization." *W. Va. v. EPA*, 142 S. Ct. at 2609. By not basing their new spending program on "clear congressional authorization," Respondents are exceeding a "specific constitutional limitation." *Flast v. Cohen*, 392 U.S. 83, 103 (1968).

43.     The unfettered discretion that the Secretary claims via the HEROES Act fails the intelligible-principle test and violates the Vesting Clause. *See Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (finding violation of the Vesting Clause where "Congress gave the SEC the power to bring securities fraud actions for monetary penalties within the agency instead of in an Article III court whenever the SEC in its unfettered discretion decides to do so.").

44.     A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction (or) authority." 5 U.S.C. § 706(2)(A), (B), (C). The Public Debt Cancellation fits all of these descriptions.

45.     "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Com v. FCC*, 476 U.S. 355, 374 (1986); *Util. Air Regul. Grp.*, 573 U.S. at 324 ("When an agency claims to discover in a long-extant

statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (internal citation omitted).

46.     Here, the agency's interpretation of the HEROES Act of 2003 renders it a delegation with no intelligible principle and an "unheralded power" heretofore undiscovered by the agency. It is an unconstitutional violation of the Vesting Clause and fundamental principles of nondelegation.

### THIRD CAUSE OF ACTION

### Violation of Plaintiff's Rights under the

### Administrative Procedure Act

47.     Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs of this Complaint.

48.     Defendants are "agencies" under the Administrative Procedure Act, 5 U.S.C. § 551(1), the Public Debt Cancellation is an "(a)gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704.

49.     The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). As previously outlined, the Public Debt Cancellation violates the Constitution's Appropriations and Vesting Clauses, critical features of the structural separation of powers that protects our rights.

50.     The APA prohibits agency actions that are "arbitrary, capricious, (or) an abuse of discretion." 5 U.S.C. § 706(2)(A).

51.     Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations omitted).

52.     These procedures exist "to ensure that unelected administrators, who are not directly accountable to the populace, are forced to justify their quasi-legislative rulemaking before an informed and skeptical public." *New Jersey v. Dep't of Health & Human Servs., 67*0 F.2d 1262, 1281 (3d Cir. 1981). By requiring notice and comment, the APA "ensure(s) that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979). By imposing these safeguards upon the executive branch, Congress imposed a procedure check on "the dangers of arbitrariness and irrationality in the formulation of rules." *Weyerhaeuser Co. v. Castle*, 590 F.2d 1011, 1027-28 (D.C. Cir. 1978).

53.     Defendants seek cover under the limited exemption to notice-and-comment in the HEROES Act of 2003. But the text and purpose of the Act show that it does not apply, and therefore, provides no exemption to the APA's regular process.

54.     As *Bennet* notes,

> The (Administrative Procedure Act), by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,' 5 U.S.C. § 704, and applies universally 'except to the extent that--(1) statutes preclude judicial review; or (2) agency . . . action is committed to agency discretion by law,' § 701(a).

520 U.S. at 175. The violation of procedural rights alone can confer standing:

> The violation of procedural rights provides a cognizable injury sufficient to provide standing and satisfy redressability concerns. A plaintiff can show a cognizable injury if it has been deprived of a procedural right to protect its concrete interests. A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right. The redressability requirement is lighter when the plaintiff asserts deprivation of a procedural right. When a

17

litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.

*Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (cleaned up).

55.     The Public Debt Cancellation is arbitrary and capricious. The Federal Register notice does not even attempt to explain how the mass categories of cancellation tie into the three bare minimum legal requirements of the HEROES Act of 2003 identified by the agencies: that these were (1) affected individuals, (2) for whom the emergency was the but-for cause of financial injuries, and that (3) this relief is necessary to put these individuals in a no worse off position than without the emergency. Since the HEROES Act of 2003 does not apply, the agency is without statutory basis for its actions under the Constitution and merits no exceptions to the regular process under the Administrative Procedure Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court: declare Defendants' Public Debt Cancellation unconstitutional and otherwise unlawful; enjoin its implementation and set it aside; and provide Plaintiff with the following relief:

(A)     A judgment setting aside the Public Debt Cancellation as a violation of the Administrative Procedure Act;

(B)     A declaratory judgment that Defendants' Public Debt Cancellation violates the Appropriations and Vesting Clauses of the U.S. Constitution;

(C)     A declaratory judgment that Defendants' Public Debt Cancellation violates Plaintiff's rights under the Administrative Procedure Act;

(D)     A declaratory judgment that Defendants' Public Debt Cancellation challenged in this Complaint violate Plaintiff's rights under the Administrative Procedure Act;

(E)     A preliminary and permanent injunction prohibiting the Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Public Debt Cancellation;

(F)     Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

(I)     All other further relief to which Plaintiff may be entitled.

Respectfully submitted this 27th day of October 2022.

/s/ _____

James Baehr (LSBA 35431), T.A.
Sarah Harbison (LSBA 31948)
PELICAN CENTER FOR JUSTICE
PELICAN INSTITUTE FOR PUBLIC POLICY
400 Poydras Street, Suite 900
New Orleans, LA 70130
Telephone: (504) 475-8407
james@pelicaninstitute.org
sarah@pelicaninstitute.org
Attorneys for Plaintiff